UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JILL SHYE, individually and on behalf of all
others similarly situated,

           Plaintiff,           Case No. 1:21-cv-12285

v.                                    Honorable Thomas L. Ludington
                                         United States District Judge

BOOKSPAN LLC,

           Defendant.
_____/

**OPINION AND ORDER (1) HOLDING DEFENDANT'S MOTION TO DISMISS IN ABEYANCE, (2) DIRECTING LIMITED DISCOVERY, AND (3) DIRECTING SUPPLEMENTAL BRIEFING**

This is a putative class action seeking damages for alleged violations of Michigan's Preservation of Personal Privacy Act (PPPA), MICH. COMP. LAWS § 445.1711 *et seq.*[1] Plaintiff, a Michigan resident and book-club member, alleges that Defendant, an online book seller, sold her personal information to data aggregators without her permission, resulting in "a barrage of unwanted junk mail." ECF No. 1 at PageID.1. Defendant has filed a motion to compel arbitration and dismiss the case, claiming that Plaintiff agreed to arbitrate any claims arising out of her membership. ECF No. 7. Because there is a genuine dispute of fact regarding whether Plaintiff consented to an arbitration agreement, Defendant's motion will be held in abeyance, and the parties will be directed to conduct targeted discovery and file supplemental briefing.

---

[1] Although other courts have referred to the Michigan statute as the "Video Rental Privacy Act" (VRPA), the Michigan Supreme Court has referred to it as the Preservation of Personal Privacy Act (PPPA). *See Deacon v. Pandora Media, Inc.*, 885 N.W.2d 628, 629 n.1 (Mich. 2016).

## I.

Following the enactment of similar federal legislation,[2] in 1989, Michigan enacted the PPPA, creating a private right of action for the unauthorized disclosure of personal information related to purchase or rental of books, videos, and other materials. *See* MICH. COMP LAWS § 445.1712. As relevant here, a business engaged in selling or renting books, videos, and similar materials may not disclose "to any person, other than the customer, a record or information that personally identifies the customer as having purchased, leased, rented or borrowed materials," except with the "written permission of the customer." *Id.* §§ 445.1712–13. Businesses that violate the PPPA may be liable for actual damages, attorney's fees, and—under the pre-July 2016 version of the PPPA—$5,000 in statutory damages. *Id.* § 445.1715 (amended 2016).

Before (and perhaps after) July 2016,[3] Plaintiff Jill Shye was a member of two book clubs offered by Defendant Bookspan LLC: *Doubleday Book Club* and *Literary Guild Book Club*. ECF No. 1 at PageID.5–6. During Plaintiff's membership, Defendant allegedly compiled her and other members' personal information into mailing lists, which it then sold to data aggregators. *Id.* at PageID.17–19. According to Plaintiff, Defendant never disclosed this practice to its members or sought their permission, despite "profit[ing] handsomely." *Id.* at PageID.5.

---

[2] *See* Video Privacy Protection Act of 1988 (VPPA), Pub. L. No. 100-618, § 2, 102 Stat. 3195 (codified as amended at 18 U.S.C. § 2710); *see also Pratt v. KSE Sportsman Media, Inc.*, No. 1:21-CV-11404, 2022 WL 469075, at *2 (E.D. Mich. Feb. 15, 2022) (discussing history of VPPA).

[3] Plaintiff's complaint does not specify when her subscription began or ended, only that she was a member before July 2016, when Michigan amended the PPPA to remove statutory damages. *See* ECF No. 1 at PageID.5 (alleging that she was a subscriber "during the relevant pre-July 30, 2016 time period"). Notably, the July 2016 amendments to the PPPA do not seem to apply retroactively. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439–41 (S.D.N.Y. 2016) ("[T]he amendment to the [PPPA] does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.").

In September 2021, Plaintiff brought this action on behalf of herself and all similarly situated subscribers, seeking $5,000 in statutory damages per subscriber. ECF No. 1 at PageID.25. Two months later, Defendant filed a motion to compel arbitration and dismiss the complaint. ECF No. 7. Defendant claims that when Plaintiff subscribed to the book clubs, she consented to a written arbitration agreement covering "any dispute between [them]." *Id.* at PageID.554. As a result, Defendant argues, Plaintiff cannot maintain this action in federal court and must submit to arbitration. *Id.* at PageID.554–55.

In response, Plaintiff denies awareness of and consent to an arbitration agreement. ECF No. 18 at PageID.618–19. She also argues that the alleged arbitration agreement would not cover this dispute. *Id.* at PageID.619–20.

Having reviewed the parties' briefing, this Court finds that a hearing is unnecessary and will proceed to address Defendant's motion on the papers. *See* E.D. Mich. LR 7.1(f)(2).

## II.

Defendant's motion is premised on the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.* The FAA creates "a substantive body of federal arbitration law that requires courts to enforce arbitration contracts 'according to their terms.'" *Anderson v. Charter Commc'ns, Inc.*, 860 F. App'x 374, 376 (6th Cir. 2021) (unpublished) (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019)). Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

The FAA provides two means for addressing arbitration. *See id.* §§ 3–4. Under § 3, a court "shall" stay a case for purposes of arbitration if it is "satisfied that the issue involved in such suit or proceeding is referable to arbitration under [a written arbitration agreement.]" *Id.* § 3. Similarly,

under § 4, a court "shall make an order directing the parties to proceed to arbitration in accordance with the terms of [their] agreement" if it is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." *Id.* § 4.

The difference between the two sections is largely procedural. Section 3 is usually invoked by the defendant in a federal suit, while § 4 is usually invoked by a plaintiff seeking specific performance of an arbitration agreement. *See Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 836–37 (6th Cir. 2021). Even so, a defendant's motion to compel arbitration arises under § 4 even if the motion does not cite the section. *See id.* at 837 (construing defendant's motion under § 4 because it sought to compel arbitration).

Historically, courts in this circuit have struggled to identify the appropriate standard of review for a motion to compel arbitration. In this district alone, courts have treated motions to compel arbitration as jurisdictional challenges under Rule 12(b)(1), *see, e.g.*, *Citizens Bank v. Margolis*, 509 F. Supp. 3d 967, 971 (E.D. Mich. 2020); as venue challenges under Rule 12(b)(3), *see, e.g.*, *Big City Small World Bakery Café, LLC v. Francis David Corp.*, 265 F. Supp. 3d 750, 757 (E.D. Mich. 2017); and as facial challenges under Rule 12(b)(6), *see, e.g.*, *High v. Cap. Senior Living Props. 2-Heatherwood, Inc.*, 594 F. Supp. 2d 789, 795 (E.D. Mich. 2008).

Acknowledging this confusion, the Sixth Circuit recently held that a court reviewing a motion to compel arbitration must apply the same standard of review as it would for a motion for summary judgment under Rule 56. *See Boykin*, 3 F.4th at 838. The Sixth Circuit's holding rested largely on the FAA's requirement that, before compelling arbitration, a court must find that the "making of the agreement" is not "in issue." *Id.* (quoting 9 U.S.C. § 4). "The question whether the party opposing arbitration has put the making of the arbitration contract 'in issue,'" the Sixth Circuit noted, "looks a lot like the question whether a party has raised a 'genuine issue as to any

material fact.'" *Id.* (quoting Fed. R. Civ. P. 56(c)). So, in deciding whether the making of an arbitration agreement is "in issue," courts should apply the same standard of review that they would under Rule 56. *Id.*; *see also* FED. R. CIV. P. 81(a)(6) (providing that the Federal Rules of Civil Procedure shall govern proceeding under the FAA "to the extent applicable").

Despite its endorsement of Rule 56, the Sixth Circuit did suggest that motions to compel arbitration could, in some circumstances, also be analyzed under Rule 12(b)(6). *See Boykin*, 3 F.4th at 838 (noting that "an arbitration contract could be seen as an affirmative defense to suit in a judicial forum," and that "perhaps a defendant could rely on Rule 12(b)(6) alone if it thinks dismissal is proper" (first citing *Kulukundis Shipping Co. v. Amtorg Trading Corp.*, 126 F.2d 978, 988 (2d Cir. 1942); and then citing *Atl. Marine Constr. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 61 (2013))).

But in this case, Defendant's motion relies extensively on exhibits not referenced in Plaintiff's complaint. *See generally* ECF No. 7. So even if Defendant's motion could have been construed as a facial challenge under Rule 12(b)(6), it must be analyzed as a motion for summary judgment under Rule 56. *See* FED. R. CIV. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

Accordingly, this Court will analyze Defendant's motion to compel arbitration as if it was a motion for summary judgment under Rule 56.

### III.

When considering a motion to compel arbitration, a court has four tasks:

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims

in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*McGee v. Armstrong*, 941 F.3d 859, 865 (6th Cir. 2019) (quoting *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000)).

Accordingly, the threshold question is whether the parties agreed to arbitrate. *Id.*; *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) ("Arbitration is strictly 'a matter of consent' and thus 'is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration.'" (first quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989); and then quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995))).

As the moving party, Defendant has the initial burden of identifying evidence "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If Defendant meets its burden, the burden then shifts to Plaintiff to set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). This Court must view the evidence and draw all reasonable inferences in favor of Plaintiff and determine "whether the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that [Defendant] must prevail as a matter of law." *Id.* at 251–52.

### A.

Defendant's motion relies largely on the personal declaration of Defendant's executive vice president, Clifton Knight. *See* ECF No. 7-1. Based on his review of internal records, Knight alleges that Plaintiff subscribed to the Book Clubs between August 2006 and August 2009. *Id.* at PageID.557–59. During that time, Defendant allegedly required all members, as a condition of their membership, to consent to an arbitration agreement covering "any dispute between [the

member and Defendant]." *Id.* at PageID.561–63. As evidence, Knight's declaration includes a 2008 "welcome booklet" that was allegedly mailed to new members. *See* ECF No. 7-2. The booklet contains an arbitration clause and advises members that their personal information might be used for marketing purposes. *Id.* at PageID.567. Yet due to the age of Plaintiff's membership, Knight claims that Defendant lacks a copy of Plaintiff's booklet. *Id.* at PageID.562.

In short, Defendant relies on a simple syllogism: All book club members consented to an arbitration agreement; Plaintiff was a book club member; therefore, Plaintiff must have consented to an arbitration agreement.

Plaintiff argues not with Defendant's logic but with the evidentiary basis for its claims.

### i.

First, Plaintiff argues that Knight's declaration is inadmissible for lack of personal knowledge. *See* ECF No. 18 at PageID.622–26. Plaintiff emphasizes that, according to Knight's declaration, Knight became executive vice president in 2007, one year after Plaintiff purchased her agreement. *Id.* at PageID.624–25. Plaintiff's argument is unconvincing.

"An affidavit or declaration used to support or oppose a motion [for summary judgment] [1] must be made on personal knowledge, [2] set out facts that would be admissible in evidence, and [3] show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). "[S]tatements made on belief or 'on information and belief,' cannot be utilized on a summary-judgment motion." *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015) (quoting 10B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2738 (4th ed. 2021)).

As clarified in his supplemental declaration, Knight was the executive vice president of Defendant's affiliate BMG Direct Marketing, Inc. "well before 2006." ECF No. 20 at PageID.680.

During his time at BMG, Knight "collaborated closely" with Defendant "on compliance practices and procedures" and had "direct and comprehensive knowledge of [Defendant's] legal and business affairs, including the contents of the new-member welcome booklets." *Id.* at PageID.680–81. In other words, Knight's allegation that Plaintiff must have consented to an arbitration agreement is based not on "information and belief" but on his personal knowledge of Defendant's business. *Cf. Ondo*, 795 F.3d at 605.

### ii.

Second, Plaintiff argues that the 2008 welcome booklet is inadmissible under the so-called "best evidence rule." ECF No. 18 at PageID.626. Specifically, Plaintiff claims that Defendant cannot rely on the booklet to prove the contents of her alleged arbitration agreement because the booklet is not a "duplicate" of that agreement. *Id.* (quoting FED. R. EVID. 1003).

As the Sixth Circuit has noted, the "best evidence rule" is "something of a misnomer" and "perhaps more accurately dubbed the original document rule." *DeMarco v. Ohio Decorative Prods., Inc.* 19 F.3d 1432 (6th Cir. 1994) (unpublished table decision). Under the "best evidence rule," generally, "[a]n original writing, recording, or photograph is required in order to prove its content." FED. R. EVID. 1002. Even so, a party may prove the contents of a writing with a "duplicate" or, if "all the originals are lost or destroyed, and not by the proponent acting in bad faith," with secondary evidence. FED. R. EVID. 1003; FED. R. EVID. 1004.

Here, Knight states that he has been unable to find any welcome booklets from when Plaintiff purchased her membership in 2006, despite thoroughly searching. *See* ECF No. 7-1 at PageID.560, 562; *cf. In re Oakley*, 397 B.R. 36, 47–48 (Bankr. S.D. Ohio 2008) ("In order to establish loss or destruction the proponent must, at a minimum, prove that he or she conducted a

good faith, reasonably diligent search for the written contract and that the search did not uncover the contract."), *aff'd sub nom. In re Oakely*, 431 B.R. 307 (B.A.P. 6th Cir. 2009).

Yet based on his personal knowledge, Knight claims that Defendant *did* issue welcome booklets in 2006 and that such booklets *did* contain "substantially identical" language to the 2008 welcome booklet. ECF No. 7-1 at PageID. Plaintiff does not claim that Defendant destroyed the 2006 booklets in bad faith or that Knight was negligent in his search. *Cf. Americhem Corp. v. St. Paul Fire & Marine Ins.*, 942 F. Supp. 1143, 1145 (W.D. Mich. 1995) (permitting secondary evidence of insurance policy where insurer "d[id] not dispute that the original policies [were] lost or ha[d] been destroyed").

Accordingly, Defendant may rely on Knight's personal knowledge and the 2008 welcome booklet to prove the contents of Plaintiff's alleged arbitration agreement.

**iii.**

Third and finally, Plaintiff argues that Defendant has not shown that she "manifested her assent" to be bound by the terms of an arbitration agreement. ECF No. 18 at PageID.630. She describes Knight's claim that she "would have had to agree" to Defendant's arbitration agreement as a "conclusory assertion" that is "plainly insufficient to satisfy Defendant's initial burden." *Id.* at PageID.631.

"A basic requirement of contract formation is that the parties mutually assent to be bound." *Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591, 598 (Mich. 1993) (citing *Rowe v. Montgomery Ward & Co.*, 473 N.W.2d 268, 273 (Mich. 1991)). "[T]o determine whether there was mutual assent to a contract, [Michigan courts] use an objective test, 'looking to the expressed words of the parties and their visible acts.'" *Id.* (quoting *Rowe*, 473 N.W.2d at 273).

Although Knight's initial declaration briefly discusses how prospective members join Defendant's book clubs, his supplemental declaration provides greater detail. As Knight explains, before joining either book club, a prospective member would have to "express an intention to become a member through an affirmative step." ECF No. 21 at PageID.713. Specifically, the prospective member would have to either (1) complete and return an enrollment form or (2) "tick[] a[n] [online] box," presumably on Defendant's webpage. *Id.* at PageID.713–14. In either case, the prospective member would be informed that by joining the book clubs, she was agreeing to Defendant's terms and conditions. *Id.*

After receiving a prospective member's consent, Defendant would mail a welcome booklet—like the one attached to Knight's declaration—that restated Defendant's terms and conditions, including the arbitration condition. *Id.* The booklet would also provide prospective members with a 20-day period to cancel by returning the booklet. *Id.*; ECF No. 7-2 at PageID.598. If a prospective member did not return her booklet or otherwise cancel her membership in 20 days, she "formally became a member." ECF No. 21 at PageID.714.

By her own admission, Plaintiff received a welcome booklet in the mail and did not try to cancel her membership within 20 days. *See* ECF No. 18-3 at PageID.664–65.

Viewed together, Knight's declarations satisfy Defendant's initial burden of showing that Plaintiff consented to an arbitration agreement. Defendant informed Plaintiff that by joining the book clubs she was consenting to Defendant's terms and conditions, which included an arbitration agreement. Even so, she decided to join the book clubs and remained a member for about three years. Under Michigan law, Plaintiff's conduct demonstrates her assent to the terms and conditions of the membership agreement. *See Tillman v. Macy's, Inc.*, 735 F.3d 453, 460 (6th Cir. 2013) (applying Michigan law in holding that employee accepted arbitration agreement by continuing to

work for employer and not returning opt-out form); *Dawson v. Rent-A-Ctr. Inc.*, 490 F. App'x 727, 730 (6th Cir. 2012) (applying Michigan law in holding that party's consent to arbitrate disputes "d[id] not require [him] to have signed the Solutions Agreement; he demonstrated his assent by continuing to work for Rent–Way").

Accordingly, Defendant has met its initial burden of demonstrating that Plaintiff consented to an arbitration agreement.

**B.**

Because Defendant has met its initial burden, the burden shifts to Plaintiff to set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Specifically, Plaintiff must point to evidence from which "a reasonable finder of fact could conclude that no valid agreement to arbitrate exists." *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002).

As an exhibit to her response brief, Plaintiff has filed a personal declaration denying that she ever consented to or knew of an arbitration agreement. *See* ECF No. 18-3 at PageID.664 ("At the time I purchased my memberships to the [book clubs] in or about 2006, I was not presented with, informed of the existence of, or asked to sign or otherwise consent to be bound by an agreement to arbitrate . . . ."); *id.* at PageID.664–65 ("Contrary to assertions in the Knight Declaration, the welcome letters I received in the mail . . . did not mention arbitration."); *id.* at PageID.665 ("At no time after receiving [the book club] welcome letters was I ever presented with (or otherwise notified that my memberships were subject to) an arbitration agreement . . . ."). Further, Plaintiff claims that if an arbitration agreement had been presented to her, "[she] would never have expressed [her] agreement or consent to be bound by it." *Id.* at PageID.667.

In addition to casting doubt on Plaintiff's memory, Defendant argues that Plaintiff is "equitably estopped" from challenging the contents of her welcome booklet. *See* ECF No. 21 at PageID.702–03. Specifically, Defendant argues that Plaintiff cannot "invoke[e] the membership agreement to support her claim [and] then deny[] . . . that [the] agreement applies to her." *Id.* at PageID.703.

The facts here are similar to those in *Boykin v. Family Dollar Stores of Michigan, LLC*, 3 F.4th 832 (6th Cir. 2021). In *Boykin*, Family Dollar moved to compel arbitration of an employee's racial-discrimination claim, despite lacking a copy of the employee's arbitration agreement. *Id.* at 836. Instead, Family Dollar relied on the personal declaration of a human-resources manager, who testified that all Family Dollar employees were required "to review and accept Family Dollar's arbitration agreement" during mandatory training. *Id.* The plaintiff-employee responded with an affidavit acknowledging his completion of the training but "unequivocally" denying that he ever "consent[ed] to or acknowledge[d] an arbitration agreement." *Id.*

After surveying the relevant case law, the Sixth Circuit held that the employee's affidavit created a genuine dispute of fact. *Id.* at 839–41. In doing so, the Sixth Circuit distinguished between affidavits asserting a memory lapse and affidavits that constitute an unequivocal denial. *Id.* at 840. Although "convenient memory lapses do not create [genuine] factual disputes," the *Boykin* court explained, "an 'unequivocal denial' that takes the form of admissible 'evidence' can." *Id.* at 840 (quoting *In re Arb. Between Interbras Cayman Co. v. Orient Victory Shipping Co.,* 663 F.2d 4, 7 (2d Cir. 1981) (per curiam)). The reason is that, in reviewing a motion under Rule 56, "courts must review factual disputes 'in the light most favorable to the opposing party.'" *Id.* (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)).

So, in the absence of indisputable evidence to the contrary, an employee's sworn declaration that she did not consent to an arbitration agreement creates a genuine dispute of fact. *See id.* at 840–41; *cf. Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020) ("[W]here self-serving testimony is blatantly and demonstrably false, it understandably may not create a *genuine* issue of material fact, thereby allowing a court to grant summary judgment.").

The same reasoning applies here. Like Family Dollar, Defendant relies on an inference from circumstantial evidence. And like Family Dollar's employee, Plaintiff contests that inference with a sworn declaration "unequivocally denying" that she ever consented to an arbitration agreement. *See Boykin*, 3 F.4th at 840–41. On the current record, this Court finds no reason to disregard Plaintiff's declaration as "blatantly and demonstrably false." *See Davis*, 951 at 750. For these reasons, Plaintiff's declaration creates a genuine dispute of fact.

As for Defendant's reliance on equitable estoppel, that doctrine is inapplicable here. As its name would suggest, equitable estoppel is an equitable doctrine that "preclud[es] the opposing party from asserting or denying the existence of a particular fact." *Lakeside Oakland Dev., L.C. v. H & J Beef Co.*, 644 N.W.2d 765, 770 (Mich. Ct. App. 2002) (quoting *Conagra, Inc. v. Farmers State Bank*, 602 N.W.2d 390, 405 (Mich. Ct. App. 1999). Typically, courts apply equitable estoppel when "(1) a party, by representations, admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on that belief, and (3) the other party is prejudiced if the first party is allowed to deny the existence of those facts." *Id.* at 770–71 (quoting *Conagra*, 602 N.W.2d at 405). In the realm of contracts, courts sometimes apply equitable estoppel to prevent a party seeking to an enforce an agreement from challenging other aspects of the same agreement. *See, e.g.*, *Hughes Masonry Co. v. Greater Clark Cnty. Sch. Bldg. Corp.*, 659 F.2d 836, 838–39 (7th Cir. 1981) (precluding a subcontractor from

arguing that a general contractor could not invoke the arbitration clause in a construction agreement, because "the very basis of [the subcontractor's] claim against [the general contractor] is that [the general contractor] breached the duties and responsibilities assigned and ascribed to it by [the construction agreement]").

But Plaintiff is not suing to enforce her book-club membership agreement; she is suing to enforce her statutory rights under the PPPA. *See* ECF No. 1. So, the equitable considerations that are typically present in an estoppel case are not present here. *Cf. Hughes Masonry*, 659 F.2d at 838–39; *Wampold v. Safeco Ins. Co. of Am.*, 409 F. Supp. 3d 962, 971 (W.D. Wash. 2019), *aff'd*, 820 F. App'x 598 (9th Cir. 2020) ("One touchstone for an estoppel defense is that the party to be estopped took clearly inconsistent positions."). Further, to the extent Plaintiff's complaint can be construed as an attempt to enforce her membership agreement, she does not contest the *enforceability* of the agreement. *See* ECF No. 18-3 at PageID.664 (acknowledging that she purchased the Book Club membership and received a welcome booklet). Rather, she contests the *terms* of the agreement, denying that they include an arbitration clause. *Id.*

Accordingly, Plaintiff's evidence creates a genuine dispute of fact over whether she consented to an arbitration agreement.

## C.

Because Plaintiff has successfully put "the making of the [arbitration] agreement . . . in issue," 9 U.S.C. § 4, this Court must "hold [Defendant's] motion in abeyance," direct the parties to conduct "targeted discovery on the disputed [formation] questions," and "proceed summarily" to trial on the formation question, *Boykin*, 3 F.4th at 844. The "parties may not address other issues, including merit issues, before [this Court] resolves [the] formation question[]." *Id.* In the interest

of efficiency, the parties will be directed to file supplemental briefing at the close of discovery to ensure that a genuine dispute of fact remains.

### D.

As noted in Section I, *supra*, Plaintiff also argues that even if she consented to Defendant's arbitration agreement, it does not cover her claims here. To address her argument, this Court will assume, without deciding, that Plaintiff consented to the arbitration agreement provided in the 2008 welcome booklet. *See McGee v. Armstrong*, 941 F.3d 859, 865 (6th Cir. 2019). The agreement provides:

> **Disputes**: If there is any dispute between us, it is agreed that either of us may elect to have it resolved by proceeding in small claims court or by binding arbitration administered by the National Arbitration Forum, the American Arbitration Association, or JAMS under their rules for consumer arbitrations. All disputes in arbitration will be handled just between the named parties. The arbitrator shall not have authority to conduct any proceedings on a class, private attorney general, or other representative basis; nor to entertain any claim of, nor provide any relief to, any person who is not a named party; nor to join or consolidate claims by or for individuals with different accounts. You acknowledge that this means that you may not have access to a court or jury.

ECF No. 7-1 at PageID.563.

Plaintiff argues that the arbitration agreement does not cover her claims because they "could be maintained without reference to" her membership agreement. ECF No. 18 at PageID.640 (quoting *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 504 (6th Cir. 2007)). She also argues that, because she cancelled her membership in 2009, her claims constitute a "post-expiration dispute" that is not arbitrable here. *Id.* at PageID.640–41 (citing *CPR (USA) Inc. v. Spray*, 187 F.3d 245, 255 (2d Cir. 1999)).

Although Plaintiff's first argument is baseless, her second argument presents a much closer question that ultimately deserves further briefing.

**i.**

Like other species of contract, arbitration agreements are construed under state law. *See AtriCure, Inc. v. Meng*, 12 F.4th 516, 522 (6th Cir. 2021) (noting that formation, construction, and other arbitration issues are "presumptively" state-law questions). But unlike other species of contract, arbitration agreements are also subject to the "strong federal policy in favor of arbitration." *Nestle Waters*, 505 F.3d at 503 (6th Cir. 2007). As a result, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* (quoting *Wilson Elec. Contractors, Inc. v. Minnotte Contracting Corp.*, 878 F.2d 167, 169 (6th Cir. 1989)). Indeed, "[i]n the absence of any express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Id.* (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)). Stated differently, "any doubts are to be resolved in favor of arbitration 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Id.* at 504 (quoting *Masco Corp. v. Zurich Am. Ins.*, 382 F.3d 624, 627 (6th Cir. 2004)).

Here, the arbitration agreement broadly covers "any dispute between [the parties]," which would naturally include the privacy dispute here. *Any*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/any [https://perma.cc/PY68-FZ6Y] (defining "any" as "one or some indiscriminately of whatever kind"). Moreover, the 2008 welcome booklet expressly mentions Defendant's practice of selling members' personal information, stating in part, "[Defendant] sometimes permits other companies to use [its] members' names, e-mail addresses, and mailing addresses to promote goods and services . . . If you don't want your name, e-mail address and mailing address released . . . please write to: [designated address]." ECF No. 7-2 at PageID.567. Although this language is unlikely to shield Defendant from liability, *see* MICH.

COMP. LAWS § 445.1713(a)(1) (exempting disclosure with customer's "written permission"), it does suggest that the arbitration agreement covers Defendant's data practices.

Still, Plaintiff argues that the arbitration agreement does not cover her claims because she could maintain this action "without reference to" her membership agreement.[4] That argument is without merit. To maintain an action under the PPPA, Plaintiff must prove that she is a "customer," which the statute defines as "an individual who purchases, rents, or borrows a book" or other specified materials. MICH. COMP. LAWS §§ 445.1711(a), 445.1712, 445.715. In other words, Plaintiff must prove that she purchased or rented books from Defendant. Accordingly, Plaintiff's membership agreement is a fundamental part of the case, and it is no accident that Plaintiff's complaint specifically mentions the "purchase" of her membership. *See* ECF No. 1 at PageID.6.

### ii.

Plaintiff's second argument—that the arbitration agreement does not cover her claims because she cancelled her membership in 2009—presents a much closer question.

Despite the "strong federal policy in favor of arbitration," *Nestle Waters*, 505 F.3d at 503, "[t]he object of an arbitration clause is to implement a contract, not to transcend it," *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 205 (1991). For that reason, the presumption of arbitrability survives the expiration of the underlying contract only if "(1) [the dispute] involves facts and

---

[4] Plaintiff's reliance on the "without reference to" language stems from *Fazio v. Lehman Brothers, Inc.*, in which the Sixth Circuit summarized the scope issue as whether "an action could be maintained without reference to the contract or relationship at issue." 340 F.3d 386, 395 (6th Cir. 2003). Although the Sixth Circuit has cited the *Fazio* test with approval, *see Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 504 (6th Cir. 2007), it is unclear whether the test is meant to supplement or override a textual analysis of the arbitration agreement, *see Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019) ("The FAA requires courts to 'enforce arbitration agreements according to their terms.'" (citing *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018))). Yet regardless of how the *Fazio* test is meant to be applied, Plaintiff cannot maintain this action without reference to her membership agreement, as explained *infra*.

occurrences that arose before expiration; (2) an action taken after expiration infringes a right that accrued or vested under the agreement; or (3) under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Stevens-Bratton v. TruGreen, Inc*, 675 F. App'x 563, 567 (6th Cir. 2017) (citing *Litton*, 501 U.S. at 206).

The latter two conditions are inapplicable; there is no allegation of a post-expiration act that "infringe[d] a right" under the agreement, and though the membership agreement mentions Defendant's data practices, it does not appear to contain a survival clause. *See id.*

The only condition that might apply is the first—whether the dispute "involves facts and occurrences that arose before expiration." *Id.* Emphasizing the relevant statutory period, Plaintiff states that her claims "involve[] facts and occurrences that arose between September 28, 2015 and July, 2016, long after Plaintiff cancelled her membership." ECF No. 18 at PageID.641. True as that may be, Plaintiff's claims *also* involve facts and occurrences that arose *before* she cancelled her membership, including the purchase of her membership in 2006. *See* ECF No. 18-3 at PageID.664.

The involvement of both pre-expiration and post-expiration facts introduces another wrinkle into the analysis. According to the Sixth Circuit, when "some, but not all, of the facts and occurrences arose prior to [expiration]," courts must ask whether the "*majority* of the *material* facts and occurrences arose before [expiration]." *Stevens-Bratton*, 675 F. App'x at 567 (quoting *S. Cent. Power Co. v. Int'l Bhd. of Elec. Workers*, 186 F.3d 733, 740 (6th Cir. 1999)). Answering that question here would be difficult, as the material facts seem almost equally split between two time periods: 2006 to 2009 (when Plaintiff purchased her membership and provided her personal

information to Defendant) and 2015 to 2016 (when Defendant allegedly disclosed her information without permission).

Yet because the parties have not squarely addressed this issue in their briefing, this Court will not decide it today. Instead, the parties will be directed to address the issue in their supplemental briefing.

### IV.

Accordingly, it is **ORDERED** that Defendant's Motion to Dismiss is **HELD IN ABEYANCE** until further order of this Court.

Further, it is **ORDERED** that the parties are **DIRECTED** to conduct discovery on whether Plaintiff consented to an arbitration agreement with Defendant. The parties must complete discovery by **May 9, 2022.**

Further, it is **ORDERED** that the parties are **DIRECTED** to file supplemental briefs after the completion of discovery, **on or before May 27, 2022**, addressing (1) whether Plaintiff consented to an arbitration agreement with Defendant and (2) whether Plaintiff's claims primarily involve facts and occurrences that arose before the expiration of her book-club membership. The briefs may be no longer than **15 pages**. Each party may file a response brief no longer than **seven pages within 14 days** after being served with the opposing party's supplemental brief.

Dated: March 9, 2022	s/Thomas L. Ludington
	THOMAS L. LUDINGTON
	United States District Judge